Pasha S. ANWAR, et al., Plaintiffs,

v.

FAIRFIELD GREENWICH LIMITED,
et al., Defendants.

No. 09 Civ. 118(VM).

United States District Court,
S.D. New York.

Signed July 29, 2015.

Christopher Lovell, Victor E. Stewart, Jody Krisiloff, Lovell Stewart Halebian Jacobson LLP, David A. Barrett, Howard L. Vickery, II, Boies, Schiller & Flexner LLP, New York, NY, Adam S. Deckinger, Eli Justin Glasser, Jonathan Edgar Pollard, Sashi Bach Boruchow, Stuart Harold Singer, Susan E. Klock, Boies, Schiller & Flexner LLP, Fort Lauderdale, FL, for Plaintiffs.

Mark Geoffrey Cunha, Simpson Thatcher & Bartlett LLP, Allan J. Arffa, Andrew Garry Gordon, Brad Scott Karp, Leslie Gordon Fagen, Patrick James Somers, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Sarah Loomis Cave, Gabrielle Sean Marshall, William R. MaGuire, Hughes Hubbard & Reed LLP, Stephen Lee Weinstein, Eiseman, Levine, Lehrhaupt & Kakoyiannis, P.C., New York, NY, Amanda McGovern, Gilbride Heller & Brown P.A, Anisley Tarragona, Annette Urena, John T. Houchin, Joshua Daniel Clark, Brown

and Heller P.A., Ricardo Alejandro Gonzalez, Greenberg Traurig, P.A., Miami, FL, Catherine Whitfield, Brown and Heller, P.A., Miami–Dade, FL, Joseph Clay Coates, III, Jon Andrew Jacobson, Lauren Whetstone, Greenberg Traurig, West Palm Beach, FL, for Defendants.

### DECISION AND ORDER

VICTOR MARRERO, District Judge.

Before this Court are two sets of lawsuits by plaintiffs asserting claims related to their investments in four feeder funds (the "Funds") founded and operated by the Fairfield Greenwich Group ("FGG").[1] The Funds, in turn, invested heavily in Bernard L. Madoff Investment Securities LLC ("BMIS"), which, as is now well known, was a Ponzi scheme operated by Bernard Madoff ("Madoff").

In the first of these actions, the "Anwar Action," a certified class of plaintiffs (the "Anwar Plaintiffs") representing shareholders and limited partners in the Funds, assert various state and federal law claims against the Funds' administrators and custodians[2] (collectively, the "Citco Defendants"), as well as state law claims against

the Funds' auditors[3] (collectively, the "PwC Defendants"). The second action, the "Standard Chartered Action," involves a number of plaintiffs (collectively, the "Standard Chartered Plaintiffs") who brought state law claims against Standard Chartered Bank International (Americas) Ltd. ("SCBI") and some of its corporate affiliates[4] (collectively, "Standard Chartered Defendants") concerning their investment advice and recommendations regarding the Funds.

At issue in this proceeding is whether the Court should dismiss any or all of these remaining state law claims in both the Anwar and Standard Chartered Actions under the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), Pub.L. No. 105–353, § 101, 112 Stat. 3227 (1998), 15 U.S.C. §§ 77p(b), 78bb(f)(1). Most relevantly, SLUSA bars the maintenance of certain state-law based class actions alleging falsity "in connection with" transactions in "covered securities." *Id.*

The Court construes the May 29, 2015 letter briefs of the PwC Defendants and the Standard Chartered Defendants (Dkt. Nos. 1383, 1384) as motions to dismiss the remaining state law claims under SLUSA.[5]

1. The feeder funds involved in these actions are Fairfield Sentry Limited, Fairfield Sigma Limited, Greenwich Sentry L.P. and Greenwich Sentry Partners L.P.

2. The fund administrators, the "Citco Administrators," include Citco Fund Services (Europe) B.V. and Citco (Canada) Inc. The fund custodians, the "Citco Custodians," include Citco Bank Nederland N.V., Dublin Branch; and Citco Global Custody N.V. The Anwar Plaintiffs also have claims remaining against the Citco parent company, Citco Group Ltd., as well as Citco Fund Services Bermuda Ltd.

3. The PwC Defendants include PricewaterhouseCoopers Accountants N.V. ("PwC Netherlands") and PricewaterhouseCoopers LLP ("PwC Canada").

4. All Standard Chartered Plaintiffs assert claims against SCBI. In addition to the claims against SCBI, three cases assert claims against Standard Chartered PLC. *See Lopez v. Standard Chartered Bank Int'l. (Americas) Ltd.,* No. 10–CV–919; *Valladolid v. American Express Bank Ltd.,* No. 10–CV–918 ("*Valladolid*"); *Barbachano Herrero v. Standard Chartered Bank Int'l (Americas) Ltd.,* No. 11–CV–3553. One case, *Valladolid,* also asserts claims against Standard Chartered International (USA) Ltd. ("SCI"), and one case *Headway Investment Corp. v. American Express Bank Ltd.,* No 09–CV–8500 ("*Headway*"), also asserts claims against Standard Chartered Bank.

5. By letter dated July 22, 2015, the Anwar Plaintiffs and Citco Defendants informed the Court that those parties had reached an

For the reasons discussed below, the Court GRANTS the PwC and Standard Chartered Defendants' motions in part and DENIES the motions in part.

## I. BACKGROUND

The Court has addressed SLUSA on prior occasions, with respect to the two related actions still pending. In *Anwar v. Fairfield Greenwich Ltd.*, 728 F.Supp.2d 372 (S.D.N.Y.2010) ("*Anwar II*"), the Court held that SLUSA did not preclude the state law claims asserted in the Anwar Action for two primary reasons: (1) the connection between the Anwar Plaintiffs' investments in the Funds, which were not "covered securities," was too attenuated with BMIS's purported investments in covered securities; and (2) because the Anwar Plaintiffs had successfully pleaded federal securities claims against the Citco Defendants, the policy objectives of SLUSA were not implicated. *See* 728 F.Supp.2d at 397–99. However, the Court has declined up until now to rule on the application of SLUSA to the Standard Chartered Action, although the Court has indicated that SLUSA preemption could be raised later in these proceedings. *Anwar v. Fairfield Greenwich Ltd.*, No. 09–CV–118, 2010 WL 1948566, at *1 (S.D.N.Y. May 5, 2010).

In the five years following *Anwar II*, the Supreme Court and the Second Circuit have clarified the contours of SLUSA preemption. As a result, the Court sought submissions by the parties in both the Anwar and Standard Chartered Actions on SLUSA preemption in light of these developments in the case law-most significantly the Second Circuit decision in *In re Kingate Management Ltd. Litig.*, 784 F.3d 128 (2d Cir.2015). Having reviewed these sub-

missions, the Court believes it is appropriate and necessary to revisit its view of the application of SLUSA to both actions.

## II. DISCUSSION

### A. STANDARD OF REVIEW

At the outset, this Court must decide whether to construe the Anwar and Standard Chartered Defendants' correspondence. as a motion for judgment on the pleadings for failure to state a claim under Federal Rule of Civil Procedure 12(c) ("Rule 12(c)"), or, alternatively, for lack of subject matter jurisdiction pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(h)(3) ("Rule 12(b)(1)" and "Rule 12(h)(3)," respectively). In *Kingate*, the Second Circuit questioned whether the district court's dismissal for failure to state a claim was the more appropriate standard of review, but the court declined to decide the issue:

> Although the issue is not presented to us, we question whether a motion to dismiss pursuant to SLUSA is best considered under Rule 12(b)(6), as a motion to dismiss for failure to state a claim, or under Rule 12(b)(1) (and/or 12(h)(3)), as a motion to dismiss for lack of subject matter jurisdiction. A dismissal under SLUSA simply means that lawsuit "may not be maintained" as a *covered class action,* 15 U.S.C. §§ 77p(b), 78bb(f)(1). It does not adjudicate against any plaintiff the right to recover on the claim. A dismissal under SLUSA would not be with prejudice, barring a plaintiff from filing a new, non-covered action asserting the same claims against the same defendants.

agreement, subject to documentation and approval by the Court, to resolve the claims asserted against the Citco Defendants. (Dkt. No. 1395; Dkt. Minute Entry for July 22,

2015.) The Citco Defendants requested that their motion regarding SLUSA be withdrawn without prejudice, and the Court so ordered. (Dkt. No. 1395.)

*Kingate,* 784 F.3d at 135 n. 9 (emphasis in original).

Typically, courts in the Southern District of New York have followed the first option described above, considering dismissal of claims under SLUSA as failing to state a claim in a pleading under Rule 12(b)(6) or judgment on the pleadings under Rule 12(c). *See, e.g., In re Adelphia Commc'ns Corp. Sec. and Derivative Litig.,* No. 03–MDL–1529, 2010 WL 3528872 (S.D.N.Y. Aug. 30, 2010); *In re Tremont Sec. Law, State Law, & Ins. Litig.,* No. 08–CV–11117, 2014 WL 1465713 (S.D.N.Y. Apr. 14, 2014). *See also Instituto De Prevision Militar v. Merrill Lynch,* 546 F.3d 1340 (11th Cir.2008).

However, dismissing claims under SLUSA for failure to state a claim raises significant doctrinal complications. First, such an approach is inconsistent with the Second Circuit's indication that a dismissal under SLUSA should never be with prejudice. Generally, when deciding a Rule 12(b)(6) or Rule 12(c) motion, courts have discretion whether to dismiss with or without prejudice. When deciding a motion under Rules 12(b)(6) or 12(c), courts often grant plaintiffs leave to re-plead when dismissing without prejudice; but if an amended complaint could not correct fundamental defects that led to dismissal and thus the exercise would be futile, courts often dismiss with prejudice. Here, re-pleading would not save a claim that would otherwise be precluded by SLUSA. Under SLUSA, a properly pleaded claim is precluded not because of some deficiency in the pleading, but rather because of procedural mechanisms by which the particular claim was brought that conflict with the purposes of the statute.

Dismissing claims under SLUSA for lack of subject matter jurisdiction, on the other hand, comports with the statutory text and the *Kingate* dictum, while also avoiding some of the difficulties that arise under application of a Rule 12(b)(6) or Rule 12(c) approach. The text of SLUSA does not directly address this issue, except for indicating that a precluded claim may not be "maintained" as part of a covered class action. 15 U.S.C. §§ 77p(b), 78bb(f)(1). This language itself suggests that preclusion involves subject matter: a traditional state law claim could survive dismissal before a state or federal court— as long as that claim is not part of a "covered class action." If, however, that claim is brought, whether in state or federal court, through a particular procedural mechanism (e.g., a class action lawsuit on behalf of more than 50 plaintiffs, or a group of such lawsuits), then no court has jurisdiction to decide that claim on the merits as long as it remains part of a covered class action. *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,* 547 U.S. 71, 87, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006) ("[SLUSA] simply denies plaintiffs the right to use the class-action device to vindicate certain claims. The Act does not deny any individual plaintiff, or indeed any group of fewer than 51 plaintiffs, the right to enforce any state-law cause of action that may exist."). Thus, courts can decide state law claims that turn on allegations of falsity, and would otherwise fall within the ambit of federal securities law claims, only when those state law claims are not covered class actions.

Dismissal under SLUSA applying the lack of subject matter jurisdiction approach is also in line with the *Kingate* footnote explaining that "[a] dismissal under SLUSA would not be with prejudice." 784 F.3d at 135 n. 9. Dismissals for lack of subject matter jurisdiction are necessarily without prejudice, because the alternative—dismissal with prejudice—would have "the effect of a final adjudication on the merits" with res judicata effect in both

state and federal court. *See Hernandez v. Conriv Realty Associates*, 182 F.3d 121, 123 (2d Cir.1999). "For this reason ... Article III deprives federal courts of the power to dismiss a case with prejudice where federal subject matter jurisdiction does not exist." *Id.*

Indeed, the Second Circuit has considered other aspects of SLUSA as raising a question of subject matter jurisdiction. *See Romano v. Kazacos*, 609 F.3d 512, 520–21 (2d Cir.2010) (considering SLUSA's removal provision as a jurisdictional question). Courts outside the Southern District of New York have similarly followed this approach, dismissing claims under SLUSA for lack of subject matter jurisdiction. *See Araujo v. John Hancock Life Ins. Co.*, 206 F.Supp.2d 377, 380 (E.D.N.Y. 2002) (performing Rule 12(b)(1) analysis after defendants moved to dismiss under SLUSA and plaintiffs moved to remand); *Marchak v. JPMorgan Chase & Co.*, 84 F.Supp.3d 197, 205 (E.D.N.Y.2015) ("Rule 12(b)(1) of the Federal Rules of Civil Procedure provides the applicable standard of review for motions to remand and motions to dismiss pursuant to SLUSA, 'because each concerns the subject matter jurisdiction of the Court.'" (quoting *Araujo*, 206 F.Supp.2d at 380)); *Rowinski v. Salomon Smith Barney, Inc.*, 398 F.3d 294, 297–98 (3d Cir.2005) (finding the SLUSA removal provision to be jurisdictional, noting that "[n]o matter how an action is pleaded, if it is a covered class action ... involving a covered security, removal is proper" (internal quotation marks omitted)); *LaSala v. Bordier et Cie*, 519 F.3d 121, 129 n. 7 (3d Cir.2008) ("SLUSA preemption is jurisdictional, and we review dismissals for lack of subject-matter jurisdiction de novo." (citing *Rowinski*, 398 F.3d at 298)); *Campbell v. Am. Int'l Grp., Inc.*, 760 F.3d 62, 64 (D.C.Cir.2014) ("Removal [under SLUSA] is for a specific purpose: when a case is removed to federal district court under

that provision, the court's jurisdiction is confined to examining whether the action in fact falls within subsection (b)'s scope of preclusion. If so, 'neither the district nor the state court may entertain it, and the proper course is to dismiss.'" (quoting *Kircher v. Putnam Funds Trust*, 547 U.S. 633, 644, 126 S.Ct. 2145, 165 L.Ed.2d 92 (2006))).

■ These considerations make clear that the SLUSA analysis is driven by a jurisdictional inquiry: can a properly pleaded state law claim be maintained in a federal or state court when it is part of a covered class action relating to covered securities? In the action at hand, the Court is persuaded that it should conduct its analysis of SLUSA preclusion under the standard for considering whether the existence of subject matter jurisdiction has been sufficiently demonstrated.

■ "[F]ailure of subject matter jurisdiction is not waivable and may be raised at any time by a party or by the court *sua sponte*." *Lyndonville Savings Bank & Trust Co. v. Lussier*, 211 F.3d 697, 700 (2d Cir.2000). "The court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff, but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir.2008) (internal quotation marks, citations, and alteration omitted), *aff'd on other grounds*, 561 U.S. 247, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010). In resolving disputed jurisdictional facts, the court can refer to evidence outside of the pleadings. *See Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir.2000).

## B. SLUSA AFTER *CHADBOURNE, HERALD, KINGATE*

Central to the actions before the Court is SLUSA's limitation on class actions, which provides:

No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging—

(A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or

(B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

15 U.S.C. § 78bb(f)(1).[6]

As the Supreme Court and the Second Circuit have recognized, the history behind the passage of SLUSA is crucial to understanding this statutory directive and the policy objectives of Congress. *See, e.g., Dabit,* 547 U.S. at 81–83, 126 S.Ct. 1503; *Kingate,* 784 F.3d at 136–40.

Following the stock market collapse in 1929 and the Great Depression, Congress enacted the Securities Act of 1933 (the "Securities Act") and the Exchange Act of 1934 (the "Exchange Act"). Those federal securities laws were designed to deter falsity propagated in connection with purchases or sales of covered securities: mainly, those statutes evince a purpose to protect individual investors and the integrity of this country's financial markets from transactions induced by defendants'

conduct in providing false, misleading, or incomplete information. In other words, these laws seek to promote truth in investing, recognizing that to the extent investors' decisions to buy or sell securities rely on false information provided by sellers and their agents, those investors may suffer financial injury. The securities markets are also harmed insofar as widespread falsity diminishes investors' trust and confidence in the markets' integrity.

To this end, the Securities Act imposes liability for falsity occurring in a registration statement (Section 11, 15 U.S.C. § 77k(a)), a prospectus or oral communication (Section 12(a), 15 U.S.C. § 77l(a)(2)), or more generally, through the use of "any device, scheme, or artifice to defraud" in the offer or sale of a security (Section 17(a), 15 U.S.C. § 77q). Similarly, the Exchange Act imposes liability for the "use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered .... any manipulative or deceptive device or contrivance ..." (Section 10(b), 15 U.S.C. § 78j). *See also* S.E.C. Rule 10b–5, 17 C.F.R. § 240.10b–5.

Since at least 1946, courts have recognized an implied private right of action under Rule 10b–5. *See Dabit,* 547 U.S. at 78–79, 126 S.Ct. 1503. As the Supreme Court has noted, this recognition brought about a substantial increase in the number of federal securities claims, including a significant number of abusive class action lawsuits by "vexatious" plaintiffs against deep-pocketed defendants. *Id.* at 81, 126 S.Ct. 1503. To curb the abuse of federal securities class action lawsuits, Congress passed the Private Securities Litigation

---

**6.** A "covered security" is defined under SLUSA as a security that satisfies the standards set forth in Section 18(b) of the 1933 Act, which is one that is " 'listed, or authorized for listing, on [the national exchanges]' or that is 'issued by an investment company that is registered, or that has filed a registration statement, under the Investment Company Act of 1940.' " *Kingate,* 784 F.3d at 139 (*quoting Romano,* 609 F.3d at 520 n. 3; 15 U.S.C. § 77r(b)).

Reform Act of 1995 (the "PSLRA"), Pub.L. No. 104–67, 109 Stat. 737 (codified in scattered sections of Titles 15 and 18 of the United States Code). Most significantly regarding the issue now before the Court, the PSLRA imposes heightened pleading requirements for federal securities fraud claims.

Subsequently, putative class action plaintiffs increasingly sought to bring securities fraud claims under state law causes of action in both state and federal court, thus attempting to avoid PSLRA's heightened pleading requirements. *See Dabit*, 547 U.S. at 81–82, 126 S.Ct. 1503. These concerns were presented to Congress in a 1997 hearing, and Congress enacted SLUSA the following year.

■ In essence, SLUSA provides that insofar as the claims that plaintiffs bring through class action litigation are grounded on false conduct of defendants (material misrepresentations or omissions) carried out in connection with the purchase or sale of covered securities, investors injured may pursue only one source of relief: the remedies and procedures available through the federal securities laws.

■ SLUSA sought to streamline and expedite securities litigation by precluding overlapping federal and state law claims. To this end, if the crux of state law claims brought by more than 50 plaintiffs entails false conduct, and the evidence supporting the state law claims those plaintiffs assert in federal class action litigation is essentially the same as that on which their federal securities claims are grounded, the federal laws provide the exclusive source of class action liability, as well as recovery solely in federal courts.

In 2010, when this Court first addressed the applicability of SLUSA to the Anwar Action, it did so without the benefit of four now precedential decisions: the Supreme Court's ruling in *Chadbourne & Parke LLP v. Troice*, —— U.S. ——, 134 S.Ct. 1058, 188 L.Ed.2d 88 (2014), as well as the Second Circuit's in *Kingate*, 784 F.3d 128, *In re Herald*, 730 F.3d 112 (2d Cir.2013) ("*Herald I*"), and *In re Herald*, 753 F.3d 110 (2d Cir.2014) ("*Herald II*").

Those decisions shed light on SLUSA's "in connection with the purchase or sale of a covered security" requirement. In *Chadbourne*, the Supreme Court emphasized that SLUSA precludes a claim only if an omission or misrepresentation is "material to a decision by one or more individuals (other than the fraudster) to buy or sell a 'covered security.' " 134 S.Ct. at 1066. There, the Supreme Court found that there was no material omission or misrepresentation in connection with covered securities when a group of plaintiffs bought certificates of deposit—which were not covered securities—in a bank that represented that it purchased covered securities with the proceeds of those sales, when in actuality the bank was a Ponzi scheme using the money to repay some investors and fund "elaborate lifestyles." *Id.* at 1064.

In both *Herald II* and *Kingate*, the Second Circuit has distinguished investors' purchases in Madoff feeder funds from the Ponzi scheme at issue in *Chadbourne*. In the *Herald* cases, the investors' suit was brought against two banks that provided banking services to BMIS. *Herald I*, decided slightly before *Chadbourne*, found that the state law claims asserted against BMIS's banks were precluded. Following *Chadbourne*, the Second Circuit denied a petition for panel rehearing. *Herald II*, 753 F.3d 110. The Second Circuit characterized the *Chadbourne* plaintiffs as "not seeking, directly or indirectly, to purchase covered securities," whereas the investors who sought to invest in Madoff feeder funds "attempted investments in covered

securities, albeit through feeder funds." *Herald II*, 753 F.3d at 113.

Following *Herald I* and *Herald II*, this Court declined to revisit its ruling in *Anwar II*. Notable factual distinctions remained between the PwC Defendants and the banking defendants in *Herald I*. Whereas the defendant banks in *Herald I* provided services solely and directly to BMIS, the connection of the PwC Defendants to BMIS was more attenuated. The PwC Defendants provided services to the Funds, rather than to BMIS directly.

*Kingate*, however, has all but foreclosed such a distinction. In *Kingate*, the investors' suit was brought against managers, a consultant, and an auditor of certain Madoff feeder funds. The Second Circuit applied the reasoning applied in *Herald I* to these defendants, finding that the *Kingate* investors similarly expected that the feeder funds were investing proceeds in S & P 100 stocks, which are covered securities. *See Kingate*, 784 F.3d at 142.

■ Similarly, here, the Anwar Plaintiffs invested in the Funds with the expectation that those proceeds would, in turn, be invested in covered securities. The question of whether the Anwar Plaintiffs' investments were in connection with covered securities no longer turns on whether there was, in fact, actual investment in covered securities. Following *Kingate*, the Anwar Plaintiffs' investments in the Funds were sufficiently "in connection with" covered securities because the Anwar Plaintiffs expected that their investments would involve covered securities through Madoff's "split strike conversion strategy." (*See, e.g.*, Second Consolidated Amended Complaint ("SCAC"), Dkt. No. 273 ¶ 184.) Similarly, the Standard Chartered Plain-

tiffs invested in the Funds with the expectation that the proceeds would be invested in covered securities. (*See, e.g., Mantecon v. Standard Chartered Bank Int'l (Americas) Ltd.* ("*Mantecon* "), No. 11–CV–5729, Compl. ¶ 62(b) (indicating the expectation that the Funds were investing in S & P 100 index stocks, as well as puts and calls related to those stocks).)

■ As this Court now finds that claims against the PwC and Standard Chartered Defendants involve investments made in connection with covered securities, it must consider which, if any, state law claims are precluded under SLUSA.[7] Again, *Kingate* is instructive:

> SLUSA requires courts first to inquire whether an allegation is of conduct by the defendant, or by a third party. Only conduct by the defendant is sufficient to preclude an otherwise covered class action. Second, SLUSA requires courts to inquire whether the allegation is necessary to or extraneous to liability under the state law claims. If the allegation is extraneous to the complaint's theory of liability, it cannot be the basis for SLUSA preclusion.

*Kingate*, 784 F.3d at 142–43. Under this approach, SLUSA precludes "state law claims predicated on conduct by *the defendant* that is specified in SLUSA's operative provisions referencing the anti-falsity proscriptions of the 1933 and 1934 Acts," and which would normally be "subject to the PSLRA if pleaded as a private securities claim (regardless of whether such a private claim could succeed)." *Id.* at 146 (emphasis in original). When conducting this analysis, as *Kingate* instructs, courts should make this determination on a claim-

---

7. Also disputed in the Standard Chartered Action is whether those individual actions constitute a "group of lawsuits" so as to qualify as a "covered class action" under SLUSA. For reasons discussed *infra*, this Court finds that the Standard Chartered cases constitute a group of lawsuits for purposes of considering SLUSA preclusion.

by-claim basis and the outcome should not depend on whether plaintiffs have artfully pleaded their claims to avoid SLUSA's terms. *Id.* at 143, 149.

Applying this standard to the Madoff feeder funds at issue in *Kingate,* the Second Circuit found that three groups of allegations would be precluded under SLUSA: (1) allegations "predicat[ing] the named Defendants' liability on their own fraudulent misrepresentations and misleading omissions, made in connection with the Funds' investments with Madoff in covered securities and with their oversight of these investments"; (2) allegations premising liability on "Defendants' negligent misrepresentations and misleading omissions in connection with the Funds' investments with Madoff and with oversight of Madoff's operations"; and (3) allegations "predicat[ing] liability on Defendants' aiding and abetting (rather than directly engaging in) the frauds underlying the [fraudulent misrepresentations and misleading omissions] claims." *Id.* at 134–35, 151. Not precluded under SLUSA, however, were allegations that "predicat[ed] liability on Defendants' breach of contractual, fiduciary, or tort-based duties owed to Plaintiffs, resulting in failure to detect the frauds of Madoff and BMIS" or that "seek compensation for fees paid to the named Defendants by the Funds on the grounds that those Defendants failed to perform the duties for which the fees were paid, or that the fees based on purported profits and values of the Funds were computed on the basis of inaccurate values." *Id.* at 135, 151–52.

Ultimately, what *Kingate* asks courts to determine comprises two inquiries: whether plaintiffs' state law class action claims assert conduct not compensable under the federal securities law, or whether such claims fundamentally constitute a species of federal securities class action litigation arising out of the same transaction, but artfully camouflaged as state law causes of action. The Court now turns to a claim-by-claim analysis of the remaining claims asserted against the PwC and Standard Chartered Defendants.

## C. THE ANWAR ACTION: Claims Against the PwC Defendants

In *Anwar II,* this Court held that SLUSA did not preclude the state law claims asserted in the Anwar Action.[8] Crucial to this determination was the finding that the connection between the Plaintiffs' investments in the Funds to transactions in covered securities was too attenuated. 728 F.Supp.2d at 397–99. As discussed *supra,* in light of *Kingate,* the Court finds that the Anwar Plaintiffs' investments in the Feeder Funds were in fact made in connection with covered securities.[9]

 Two claims remain against the PwC Defendants: state law causes of action asserting negligence and negligent misrepresentation.[10] In earlier decisions, the Court has found that the Anwar Plaintiffs have adequately pleaded and can show through common evidence that a duty of care was owed by the PwC Defendants to Anwar Plaintiffs who made subsequent in-

---

8. *Anwar II* determined that New York law applies to the Anwar Plaintiffs' common law claims. 728 F.Supp.2d at 400.

9. The Anwar Plaintiffs also acknowledge that after *Kingate,* "SLUSA's 'in connection with' requirement is satisfied by transactions that involve feeder funds." (Dkt. No. 1387 at 1.)

10. In *Anwar II,* the Court dismissed other state law claims against the PwC Defendants, as well as all federal claims. *See* 728 F.Supp.2d at 450–60.

vestments in the Funds.[11] *See Anwar II,* 728 F.Supp.2d at 454–57; *Anwar v. Fairfield Greenwich Ltd.,* 884 F.Supp.2d 92, 97–98 (S.D.N.Y.2012); *Anwar v. Fairfield Greenwich Ltd.,* 306 F.R.D. 134, 141–44 (S.D.N.Y.2015) ("*Anwar VI* ").

The Court will now consider the claim-by-claim analysis that *Kingate* directs to determine whether the negligence and negligent misrepresentation claims the Anwar Plaintiffs assert against the PwC Defendants are precluded under SLUSA.[12]

### 1. Negligence

 Under New York law, to state a claim for negligence, a plaintiff must allege "(1) that the defendant owed him or her a cognizable duty of care; (2) that the defendant breached that duty; and (3) that the plaintiff suffered damage as a proximate result of that breach." *Di Benedetto v. Pan Am World Serv.,* 359 F.3d 627, 630 (2d Cir.2004). In *Anwar II,* the Court found that the Anwar Plaintiffs pleaded plausible negligence claims against the PwC Defendants. 728 F.Supp.2d at 457. *See also Anwar VI,* 306 F.R.D. 134, 141–43 (finding that common evidence could show that the PwC Defendants owed the Anwar Plaintiffs a duty of care under *Credit Alliance* ).

 The crux of the Anwar Plaintiffs' negligence claim against the PwC Defendants is that, allegedly, "PwC negligently failed to exercise due care by failing to properly audit the Funds in accordance with [generally accepted auditing standards ('GAAS') ] and other applicable auditing standards and thereby caused injury to the Plaintiffs, who have lost all, or substantially all of their investments in the Funds." (SCAC ¶ 437.)

The PwC Defendants argue that this negligence claim is precluded because it is predicated on allegations of misrepresentations and omissions. (Dkt. No. 1383 ("May 29, 2015 PwC Letter Motion") at 2.) This conclusion follows, they argue, because their duty to the Anwar Plaintiffs is premised on satisfying *Credit Alliance,* which requires investors to have relied to their detriment on inaccurate financial reports. (*Id.* at 3–4.) The Anwar Plaintiffs, on the other hand, argue that *Credit Alliance* is a standing doctrine for determining whether accountants owe a duty of care, whereas the reliance on an inaccurate financial report is not a necessary element of a negligence claim once a duty of care is established. (Dkt. No. 1392 ("June 8, 2015 Anwar Pls.' Letter") at 3–4.)

The Court is not persuaded by the PwC Defendants' argument. In applying the *Credit Alliance* test, the Court has looked to whether investors relied on the relevant financial materials issued by the PwC De-

---

11. Under the test elaborated in *Credit Alliance Corp. v. Arthur Andersen & Co.,* 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110 (1985) ("*Credit Alliance* "), for accountants to be held liable in negligence to noncontractual parties "who rely to their detriment on inaccurate financial reports," the defendant must have been (1) "aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the ac-

countants' understanding of that party or parties' reliance." *Id.* at 551, 493 N.Y.S.2d 435, 483 N.E.2d 110.

12. The Court notes that, unlike in the Standard Chartered Action, the Anwar parties have not disputed whether the Anwar Action is a "covered class action" under SLUSA. As the Anwar Plaintiffs' complaint names significantly more than 50 claimants and seeks damages on behalf of an even larger class, this case clearly qualifies as a "covered class action" under SLUSA.

fendants, but not whether investors relied on misrepresentations contained therein. *See, e.g., Anwar VI*, 306 F.R.D. at 143. The *Credit Alliance* test determines whether an auditor owes a noncontractual party a duty of care; to establish the existence of such a duty does not require that the auditor engage in false conduct. Conceivably, an accountant, in violation of a duty of care and for reasons unrelated with any scheme to harm noncontractual parties, might issue a report containing inaccurate or incomplete information on which investors detrimentally rely, giving rise to negligence claims unrelated to securities claims by such investors based on falsity.

Here, the Anwar Plaintiffs allege that the PwC Defendants breached their duties to audit the Funds in accordance with generally accepted domestic and international auditing standards. Failure to abide by such standards could constitute a breach of duty, regardless of whether representations implicating auditing standards were made in financial documents. The Anwar Plaintiffs do not allege that PwC was somehow complicit in Madoff's fraud; instead, here, "[the PwC] Defendants, like Plaintiffs, were victims of Madoff's frauds." *Kingate*, 784 F.3d at 152. Indeed, the Second Circuit has noted that allegations that an auditor negligently examined his clients' securities transactions and failed to uncover fraud would not be precluded under SLUSA. *See id.* at 148. Similarly here, the PwC Defendants owed duties of care to the Anwar Plaintiffs, and their alleged failure to follow industry-standard auditing procedures constituted a breach of that duty. Therefore, the Court finds that the negligence claims against the PwC Defendants are not precluded by SLUSA.

**2. Negligent Misrepresentation**

█ To sufficiently allege a negligent misrepresentation claim under New York law, a plaintiff must plead that "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the defendant knew that the plaintiff desired the information supplied in the representation for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F.Supp.2d 163, 198 (S.D.N.Y.2006) (*citing Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir.2000)).

█ In *Anwar II*, the Court found that the Anwar Plaintiffs had sufficiently pleaded negligent misrepresentation claims against the PwC Defendants. 728 F.Supp.2d at 457. As part of this claim, the Anwar Plaintiffs allege two material misrepresentations: (1) that the PwC Defendants "had conducted [their] audits in accordance with GAAS or [International Standards of Auditing ('ISA')]," and (2) that the "Funds' financial statements presented fairly, in all material respects, the financial position of the Funds." (SCAC ¶ 440 (internal quotation marks and alterations omitted).)

The PwC Defendants argue that these alleged misrepresentations are squarely precluded by *Kingate*, because these allegations premise liability on "Defendants' negligent misrepresentations and misleading omissions in connection with the Funds' investments with Madoff." (May 29, 2015 PwC Letter Motion at 4–5 (*quoting Kingate*, 784 F.3d at 151).) The Anwar Plaintiffs, on the other hand, argue that the alleged misrepresentations relate only to the PwC Defendants' own conduct

and are independent of transactions in covered securities. (Dkt. No. 1387 ("May 29, 2015 Anwar Pls.' Letter") at 2.)

Claims regarding both types of misrepresentations-those regarding auditing standards and those regarding the financial condition of the funds—are precluded by SLUSA. As a preliminary matter, both were "made in connection with the Funds' investments with Madoff in covered securities and with [the PwC Defendants'] oversight of these investments." *Kingate*, 784 F.3d at 134–35. Here, the PwC Defendants were hired to audit funds that the Anwar Plaintiffs believed were investing in covered securities. Even though the misrepresentations do not, on their face, discuss covered securities, the purpose of the audit reports was to ascertain the accuracy of the Funds' financial condition and the Funds' purported investments in covered securities.

Further, these negligent misrepresentation claims, unlike the negligence claims, actually require a "showing of false conduct by *the named Defendants* of the sort specified in SLUSA." *Id.* at 152 (emphasis in original). Whereas the negligence claims are predicated on the failure of the PwC Defendants to abide by auditing standards that may be required even absent such language in a financial document, the Anwar Plaintiffs' negligent misrepresentation claims turn on whether the PwC Defendants, knowing about the falsity, misrepresented that they had abided by those standards when they prepared the financial report for the Funds on which the Anwar Plaintiffs relied. Thus, although both types of claims involve the PwC Defendants' failure to follow standard auditing procedures, the negligent misrepresentation claims necessarily turn on some false conduct, while the negligence claims do not. As such, the Anwar Plaintiffs' state law negligent misrepresentation claims against the PwC Defendants are precluded by SLUSA.

## D. THE STANDARD CHARTERED ACTION

The Standard Chartered Action is a consolidated action which currently comprises 56 cases involving 74 plaintiffs.[13] These actions were filed between April 2009 and December 2012 from the following jurisdictions: the Circuit Court of the 11th Judicial Circuit in and for Miami–Dade County, Florida (subsequently removed to the Southern District of Florida)[14]; the Superior Court of the State of California, County of Los Angeles (subsequently removed to the Central District of California)[15]; the Southern District of Florida[16]; and the

---

**13.** Not included in this count is *Caso v. Standard Chartered Bank International (Americas) Ltd.*, No. 10–CV–9196, which is stayed in this Court pending completion of individual arbitration in that case. (*See* Dkt. Nos. 882, 1151.)

**14.** *Headway Investment Corp. v. American Express Bank Ltd.*, No 09–CV–8500 ("*Headway*"); *Almiron v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 10–CV–6186 ("*Almiron*"); *Carrillo v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 10–CV–6187 ("*Carrillo*").

**15.** *Valladolid*, No. 10–CV–918.

**16.** *Lopez v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 10–CV–919 ("*Lopez*"); *Maridom Ltd. v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 10–CV–920 ("*Maridom*"); *Gerico, Inc. v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 11–CV–909 ("*Gerico*"); *Baymall Invs. Ltd. v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 11–CV–7649 ("*Baymall*"); *Blockbend Ltd. v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 11–CV–7650 ("*Blockbend*"); *Escobar v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 11–CV–6787 ("*Escobar*"); *Eastfork Assets Ltd. v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 11–CV–7653 ("*Eastfork*"); *Mailand Invs., Inc. v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 11–CV–

Southern District of New York.[17] The Judicial Panel on Multidistrict Litigation (the "MDL Panel") transferred these cases to this Court, which consolidated the actions

for pretrial purposes. (*See, e.g.,* Dkt. Nos. 282, 607.)

After the Court considered numerous motions to dismiss in various actions,[18] it

5732 ("*Mailand*"); *Barbachano Herrero v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 11–CV–3553 ("*Barbachano*"); *Asensio v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 11–CV–908 ("*Asensio*"); *Auburn Overseas Corp. v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 11–CV–904 ("*Auburn*"); *Interland Invs. Corp. v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 11–CV–905 ("*Interland*"); *Iston Holdings Ltd. v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 11–CV–901 ("*Iston*"); *New Horizon Dev. Inc. v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 11–CV–898 ("*New Horizon*"); *Perez v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 11–CV–903 ("*Perez*"); *Rendiles v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 11–CV–902 ("*Rendiles*"); *Ruiz v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 11–CV–900 ("*Ruiz*"); *Salcar Ltd. v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 11–CV–899 ("*Salcar*"); *Triple R Holdings Ltd. v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 11–CV–897 ("*Triple R*"); *Velvor, S.A. v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 11–CV–906 ("*Velvor*"); *5C Invs. Ltd. v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 11–CV–907 ("*5C Invs.*"); *Bahia Del Rio, S.A. v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 11–CV–5716 ("*Bahia Del Rio*"); *Archangel Res. Ltd. v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 11–CV–5717 ("*Archangel*"); *Blount Int'l v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 11–CV–5719 ("*Blount*"); *Diaz de Camara v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 11–CV–5720 ("*Diaz de Camara*"); *Dougherty v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 11–CV–5721 ("*Dougherty*"); *De Passos Vieira Lima v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 11–CV–5722 ("*De Passos*"); *Echeverri de Mata v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 11–CV–5723 ("*Echeverri*"); *Dougherty Novella v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 11–CV–5724 ("*Dougherty Novella*"); *Richmon Co. v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 11–CV–5725 ("*Richmon*"); *Sabillon v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 11–CV–5726 ("*Sabillon*"); *San Blas S.A. v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 11–CV–5727 ("*San Blas*"); *Smerant Corp. v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 11–CV–5728 ("*Smerant*"); *Mantecon v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 11–CV–5729 ("*Mantecon*"); *Pharmafoods Int'l. C.V., et al. v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 11–CV–5730 ("*Pharmafoods*"); *Tierra, C.V. v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 11–CV5731 ("*Tierra*"); *Mizrahi v. Standard Chartered Bank Int'l (Americas) Ltd.*, 11–CV–6788 ("*Mizrahi*"); *Quiroz Stone v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 11–CV–7651 ("*Quiroz Stone*"); *Nautical Village, Inc., v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 11–CV–7652 ("*Nautical Village*"); *Positano Inv. Ltd. v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 11–CV–8371 ("*Positano*"); *Maplehurst Holdings Ltd. v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 11–CV–8372 ("*Maplehurst*"); *Sand Overseas Ltd. v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 12–CV–148 ("*Sand*"); *Rebac Enters. Ltd. v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 12–CV–3969 ("*Rebac*"); *Brea Int'l Ltd. v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 12–CV–3970 ("*Brea*"); *Diaz v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 12–CV–9146 ("*Diaz*"); *Rosental v. Standard Chartered Bank Int'l (Americas) Ltd.*, 12–CV–9421 ("*Rosental*"); *Lyac Venture Corp. v. Standard Chartered Bank Int'l (Americas) Ltd.*, 12–CV–9422 ("*Lyac*"); *Boltvinik de Uziel v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 12–CV–9423 ("*Boltvinik*"); *TRE–C, S.A. v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 12–CV–9425 ("*TRE–C*"); *Skyworth Prods. Ltd. v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 12–CV–9427 ("*Skyworth*"); *Optic Blue Ltd. v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 12–CV–9426 ("*Optic Blue*").

**17.** *Saca v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 11–CV–3480 ("*Saca*").

**18.** This Court has ruled on three motions to dismiss regarding the remaining state law actions asserted against the Standard Chartered Defendants. *See Anwar v. Fairfield Greenwich*

sustained five types of state law claims against the Standard Chartered Defendants: breach of fiduciary duty, negligence, gross negligence, negligent misrepresentation, and fraud. As discussed *supra,* in light of *Kingate,* the Court finds that the Standard Chartered Plaintiffs' investments in the Funds were made in connection with covered securities.

### 1. "Groups of Lawsuits" as Covered Class Actions

In dispute in the Standard Chartered Action is whether the 56 Standard Chartered cases constitute a "group of lawsuits" under SLUSA's "covered class action" definition. As a threshold matter, SLUSA precludes certain state law claims only in "covered class actions." As defined in SLUSA, a "covered class action" is:

(i) any single lawsuit in which—

 I. damages are sought on behalf of more than 50 persons or prospective class members, and questions of law or fact common to those persons or members of the prospective class, without reference to issues of individualized reliance on an alleged misstatement or omission, predominate over any questions affecting only individual persons or members; or

 II. one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated and questions of law or fact common to those persons or members of the prospective class predominate over any questions affecting only individual persons or members; or

(ii) any group of lawsuits filed in or pending in the same court and involving common questions of law or fact, in which—

 I. damages are sought on behalf of more than 50 persons; and

 II. the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose.

15 U.S.C. § 78bb(f)(5)(B).

The Standard Chartered Plaintiffs argue that a set of cases should constitute a "group of lawsuits" only if such actions collectively were the product of deliberate and purposeful collusion or collaboration among the plaintiffs. (Dkt. No. 1349 ("Nov. 17, 2014 SCB Pls.' Letter").) In support of their contention, the Standard Chartered Plaintiffs raise two main arguments. First, they assert that the plain meaning of "group" involves purposeful gathering. Here, they argue, the various plaintiffs' lawsuits were filed separately without a joint, purposeful plan, and were involuntarily joined together in this Court by reason of the MDL Panel's action. (*Id.* at 17.) Second, the Standard Chartered Plaintiffs argue that SLUSA's legislative findings and history show that the statute sought to prevent collusive or collective action—but not uncoordinated, separately filed actions that were involuntarily consol-

---

Ltd., 745 F.Supp.2d 360 (S.D.N.Y.2010) ("*Anwar III* "); *Anwar v. Fairfield Greenwich Ltd.,* 826 F.Supp.2d 578 (S.D.N.Y.2011) ("*Anwar IV* "); *Anwar v. Fairfield Greenwich Ltd.,* 891 F.Supp.2d 548 (S.D.N.Y.2012) ("*Anwar V* "). Additional plaintiffs have stipulated to dismissal of certain claims following these decisions. (*See* Dkt. Nos. 936, 1193.)

Additionally, the Court has dismissed multiple other cases and plaintiffs in various Decisions and Orders. *See, e.g., Anwar v. Fairfield Greenwich Ltd.,* 831 F.Supp.2d 787, 789–90 (S.D.N.Y.2011) (dismissing *Pujals v. Standard Chartered International (Americas) Ltd.,* No. 10–CV–2878); *Anwar v. Fairfield Greenwich Ltd.,* 742 F.Supp.2d 367, 375 (S.D.N.Y.2010) (granting motion to dismiss two actions based on forum selection clauses and *forum non conveniens* ).

idated or otherwise grouped together. (*Id.* at 18–19.)

The Court is not persuaded by these arguments. Courts in this District, as elaborated below, have overwhelmingly found similarly joined lawsuits to constitute a "group" under SLUSA. In considering whether a set of lawsuits is a "group," courts have considered numerous factors, including whether the plaintiffs have common counsel, whether the allegations are substantially identical, whether lawsuits have been referred to a single court at the direction of an MDL panel, whether plaintiffs have filed joint court filings, and whether the lawsuits are otherwise subject to joint procedural treatment in a single court. *See, e.g., Amorosa v. Ernst & Young LLP,* 682 F.Supp.2d 351, 376–77 (S.D.N.Y.2010) (*"Amorosa II"*) (finding individual lawsuit was part of a covered class action when, among other factors, amended complaint reflected similar or virtually identical allegations as related cases), *aff'd sub nom. Amorosa v. AOL Time Warner Inc.,* 409 Fed.Appx. 412 (2d Cir.2011); *Gordon Partners v. Blumenthal,* No. 02–CV–7377, 2007 WL 1438753, at *3 (S.D.N.Y. May 16, 2007) (approval of magistrate's finding that a group of lawsuits had proceeded as "a single action for any purpose" after they were consolidated for pretrial purposes), *aff'd on other grounds,* 293 Fed.Appx. 815 (2d Cir.2008); *Markey v. Citigroup, Inc.,* No. 09–MDL–2070, 2013 WL 6728102, at *5 (S.D.N.Y. Dec. 20, 2013) ("[Actions] are proceeding as 'a single action for any purpose' within the meaning of SLUSA when they are grouped together as part of an MDL." (internal citation omitted)); *In re Refco Sec. Litig.,* 859 F.Supp.2d 644, 647–49 (S.D.N.Y.2012) (finding that multiple actions proceeded as a single action "for any purpose" in an MDL proceeding where it was accepted as "related" to that proceeding, had coordinated discovery

with other actions, shared fees for the services of Special Masters, and participated in joint status conferences); *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.,* No. 03–MDL1529, 2010 WL 3528872, at *5 (S.D.N.Y. Aug. 30, 2010) ("The present action is one of more than 50 actions pending in this district as a multidistrict litigation, in which damages are sought for more than 50 people. It is plainly a covered class action."); *In re Citigroup Inc. Sec. Litig.,* 987 F.Supp.2d 377, 387 (S.D.N.Y.2013) (finding individual plaintiffs' state law claims were precluded under SLUSA after an MDL transfer, even if not formally joined or consolidated, because it was "proceeding as a single action for any purpose" under SLUSA).

Plaintiffs also argue that the purpose of SLUSA is to prevent *deliberate* attempts by class action plaintiffs to evade PSLRA's heightened pleading standards, but not to prevent bona fide individual actions of fewer than 51 plaintiffs. Indeed, SLUSA's legislative findings do state that SLUSA should "preserv[e] the appropriate enforcement powers of State securities regulators and not chang[e] the current treatment of individual lawsuits." SLUSA, Pub.L. No. 105–353, § 2(5), 112 Stat. 3227 (1998). The Senate Report similarly stated that the "Committee does not intend for the bill to prevent plaintiffs from bringing bona fide individual actions simply because more than fifty persons commence actions in the same state court against a single defendant." S.Rep. No. 105–182, 1998 WL 226714, at *7 (May 4, 1998).

But on this point the legislative history of SLUSA is not so simple; indeed, it is ambiguous. The Senate Report acknowledged that the law could affect individual actions that were involuntarily consolidated: "[T]he provisions of the bill would apply where the court orders that the suits be joined, consolidated, or otherwise pro-

ceed as a single action at the state level. The Committee also notes that when such suits proceed as a single action in state court, it is frequently at the request of the plaintiffs." *Id.* at \*8. Thus, the Senate Report implies that the Senate Committee recognized that actions consolidated *not* at the plaintiffs' request could still constitute a group of lawsuits subject to SLUSA. Additionally, Congress adopted the current version of SLUSA despite objections by some Senators who had argued that the proposed language could be read to deprive individual investors of a state law remedy if they happened to file in the same court as other individual investors. *See id.* at \*20.

Based on these preceding considerations, the Court concludes that the Standard Chartered cases constitute a "group of lawsuits" for the purposes of SLUSA. They are all pending in this Court, involve common questions of law or fact against the Standard Chartered Defendants (i.e., alleging that the Standard Chartered Defendants induced the Plaintiffs to invest in the Funds based on unsupported investment advice), seek damages on behalf of more than 50 persons, and, by decision of the MDL Panel, are "joined, consolidated, or otherwise proceed as a single action for any purpose" under SLUSA. 15 U.S.C. § 78bb(f)(5)(B).

SLUSA's language does not indicate that the statute preempts only those claims that were purposefully grouped together by more than 50 plaintiffs. Instead, the act considers groups of lawsuits proceeding as a single action *"for any purpose."* *Id.* (emphasis added). Indeed, SLUSA was adopted notwithstanding some objections indicating concern over this issue, and the overwhelming majority of courts have decided SLUSA preclusion

without an inquiry into whether there was a purposeful grouping of lawsuits by plaintiffs. *See, e.g., In re Citigroup Inc. Sec. Litig.,* 987 F.Supp.2d at 388 ("It is true that [the plaintiff] did not purposefully direct his lawsuit to this court, nor is his complaint a verbatim copy of the other complaints, nor is he represented by the same counsel as other plaintiffs. SLUSA, however, does not instruct the Court to consider any of these factors.").

Here, the MDL Panel referred the individual Standard Chartered cases to this Court, which consolidated the Standard Chartered Action for pretrial purposes. (*See, e.g.,* Dkt. Nos. 282, 607.) On multiple occasions, the Standard Chartered Plaintiffs have submitted joint requests, submissions, and filings (*see, e. g.,* Dkt. Nos. 445, 828, 1244), and common counsel represents many of the total number of plaintiffs.[19] Indeed, this type of coordination has undoubtedly helped plaintiffs. For example, as Liaison Counsel for the Standard Chartered Plaintiffs has noted, Plaintiffs were able to "coordinate discovery." (Dkt. No. 1329 ("Transcript of Sept. 29, 2014 Conference") at 23.) Later-filed actions also had the benefit of Court decisions on earlier-filed motions. After the Court decided multiple motions to dismiss on earlier filed cases, subsequent plaintiffs were able to draft adequately pleaded allegations in their complaints and stipulate dismissals of claims with the Standard Chartered Defendants without resorting to motion practice. *See, e. g., Anwar III,* 745 F.Supp.2d 360; *Anwar IV,* 826 F.Supp.2d 578; *Anwar V,* 891 F.Supp.2d 548. (*See also* Dkt. Nos. 936, 1193.) Indeed, at the September 29, 2014 conference before this Court, Plaintiffs' Liaison Counsel acknowledged that "many of [the complaints] brought by the same lawyer are substantially identi-

19. The 74 plaintiffs are represented by a total of nine law firms. Curran & Associates repre- sents 54 of those plaintiffs; Marko & Magnolick, P.A. represents 8 of those plaintiffs.

cal." (Transcript of Sept. 29, 2014 Conference at 33.) The Court has previously recognized the similarities among many of these complaints as well. *See Anwar IV*, 826 F.Supp.2d at 590.

Additionally, at Plaintiffs' request (*see* Dkt. No. 291), Magistrate Judge Theodore Katz appointed the Standard Chartered Plaintiffs' Steering Committee ("Steering Committee") to, among other tasks, "initiate, coordinate and conduct all discovery on behalf of all plaintiffs," "[s]peak for all Standard Chartered Plaintiffs at pretrial proceedings and in response to any inquiries by the Court," and to "[n]egotiate and enter into stipulations on behalf of the Standard Chartered Plaintiffs ... regarding this litigation." (Dkt. No. 602 at 3–4.) The four attorneys initially appointed to the Steering Committee represent the four earliest filed cases that are currently pending in the Standard Chartered Action. (*Id.* at 2.) Thus, even though an MDL Panel transfer and consolidation for pretrial purposes is sufficient for the "group of lawsuits" analysis under SLUSA, the Standard Chartered Plaintiffs have also coordinated significant aspects of this litigation.

 This result is consistent with the primary purpose of SLUSA: to bring both state and federal securities fraud class action claims to federal court and subject such litigation to the heightened pleading standard of the PSLRA. Here, that policy objective of SLUSA is directly implicated. In *Anwar II*, the Court found this policy objective was not implicated in the Anwar Action because the Anwar Plaintiffs had successfully pleaded federal securities law claims under the PSLRA. 728 F.Supp.2d at 399. Unlike the Anwar Plaintiffs, the Standard Chartered Plaintiffs have not

successfully pleaded federal securities law claims. Significantly, after the Court dismissed all federal securities law claims for plaintiffs' failure to satisfy the heightened pleading requirements of the PSLRA in the first wave of Standard Chartered cases, *see Anwar III*, 745 F.Supp.2d 360, an additional 67 plaintiffs then filed actions against the Standard Chartered Defendants asserting *only* state law causes of action. (*See* Dkt. No. 1333 ("Oct. 31, 2014 SCB Letter") at 6.)

To satisfy SLUSA's policy objectives, it should not matter whether more than 50 individual plaintiffs brought substantially similar lawsuits against defendants, or whether a collective group of more than 50 plaintiffs brought these claims. Either type of action would result in the harm SLUSA sought to protect defendants against—namely, multiple state law cases, essentially class actions, that are not subject to the heightened pleading standard of the PSLRA despite being grounded on the same allegations of falsity in connection with covered securities, and based on the same evidence as their counterpart federal securities claims. Accordingly, the Court concludes that the Standard Chartered Action is a "group of lawsuits" under SLUSA. The Court now turns to a claim-by-claim analysis to determine which, if any, of the Standard Chartered Plaintiffs' state law claims are precluded by SLUSA.

### 1. State Law Claims Analysis

Following three rulings by this Court on various motions to dismiss and two stipulations among the parties, five types of state law claims remain against the Standard Chartered Defendants: breach of fiduciary duty, negligence, gross negligence, negligent misrepresentation, and fraud.[20] The

---

**20.** These prior decisions have applied Florida law to the state law claims before the Court.

*See, e.g., Anwar III*, 745 F.Supp.2d at 369.

Court notes that this Decision and Order considers only the applicability of SLUSA to the remaining state law claims, and not whether such claims satisfy any relevant pleading standards.

The Standard Chartered Plaintiffs argue that these claims can be placed in two main categories: (1) "Due Diligence Claims," which depend on allegations that the Standard Chartered Defendants failed to properly investigate the Funds before making an investment recommendation to clients; and (2) "Madoff Claims," which include claims that depend on allegations that Standard Chartered Defendants made misrepresentations or omissions in connection with the Funds' investments in BMIS.[21] (Dkt. No. 1385 ("May 29, 2015 SCB Pls.' Letter") at 5.)

The Court now finds that the Standard Chartered Plaintiffs' "Due Diligence Claims"—breach of fiduciary duty, negligence, and gross negligence—are not precluded by SLUSA. However, the "Madoff Claims"—negligent misrepresentation and fraud-are precluded by SLUSA. The Court now turns to a claim-by-claim analysis to explain its conclusions.

### a. Breach of Fiduciary Duty

Under Florida law, a fiduciary relationship arises where "a relation of trust and confidence exists between the parties (that is to say, where confidence is reposed by one party and a trust accepted by the other, or where confidence has been acquired and abused), that is sufficient as a predicate for relief. The origin of the confidence is immaterial." *Doe v. Evans,* 814 So.2d 370, 374 (Fla.2002) (quotation marks omitted) (emphasis removed). Florida has also adopted Section 874 of the Restatement (Second) of Torts, which provides that a breach of a fiduciary relationship " 'is not dependent solely upon an agreement or contractual relation between the fiduciary and the beneficiary but results from the relation.' " *Id.* (quoting Restatement (Second) of Torts Section 874 cmt. B (1979)).

The Court has previously allowed three separate theories of breach of fiduciary duty owed by broker-dealers to survive motions to dismiss in various Standard Chartered cases.[22] The first of these duties obligates securities broker-dealer defendants to conduct proper diligence before making an investment recommendation. *See Anwar III,* 745 F.Supp.2d at 375–78. Under Florida law, "even nondiscretionary broker-dealers have a duty to recommend investments only after studying them sufficiently to become informed as to their nature, price, and financial prognosis." *Id.* at 376 (quoting *Ward v. Atl. Sec. Bank,* 777 So.2d 1144, 1147 (Fla. Dist.Ct.App.2001)) (quotation marks and alterations omitted).

All plaintiffs allege this type of breach of duty, arguing that the Standard Chartered Defendants performed little or no due dili-

---

**21.** The Standard Chartered Plaintiffs also identify a third category of claims—"Non-Madoff Claims." (Dkt. No. 1385 at 5.) They argue that this category includes claims that the Standard Chartered Defendants made misrepresentations or omissions involving their investment advice and recommendations but may not directly involve the Funds' involvement with BMIS. (*Id.*) The Court notes that there are no surviving fee-based claims asserted by any of the plaintiffs, but that some plaintiffs make allegations of "trailer fees" as support for breach of fiduciary duty and negligence claims. Thus, the Court considers these allegations as made in support of breach of Standard Chartered Plaintiffs' fiduciary duty and negligence claims.

**22.** Multiple plaintiffs have stipulated that allegations of misrepresentations in their fiduciary duty claims do not support a cause of action. (*See* Dkt. Nos. 936, 1193.)

gence on the Funds before making a recommendation.[23] Such diligence could have included "typical quantitative analysis" or auditing. (*See, e.g., Lopez* Am. Compl. ¶ 49.) In support of this claim, some plaintiffs also allege that a high-ranking Standard Chartered executive admitted that no diligence at all had been done on the Funds.[24]

The second type of securities broker-dealer fiduciary duty that this Court has recognized in the Standard Chartered Action is the duty to continue to monitor investments. *See Anwar III*, 745 F.Supp.2d at 377–78. The Court has found the Standard Chartered Defendants

may owe such a duty when investors have discretionary accounts or when the Defendants act as "far more than a passive broker taking orders" and are alleged to have "reached out" to investors and "aggressively marketed" the investments. *Id.* at 377. For example, Standard Chartered account managers allegedly met personally with some plaintiffs multiple times over the course of a year. *See, e.g., Baymall* Compl. ¶ 20. Most plaintiffs have pleaded such claims.[25] However, the Court has also dismissed such claims when Defendants provided advice on "particular occasions" only, as opposed to aggressively marketing the investments.[26] *Anwar IV*, 826 F.Supp.2d at 592.

---

23. *See Headway* Compl. ¶¶ 37–38, 75–79; *Lopez* Am. Compl. ¶ 81; *Valladolid* Compl. ¶¶ 20–21; *Maridom* Am. Compl. ¶ 5; *Almiron* Compl. ¶¶ 35–36, 41, 58; *Carrillo* Compl. ¶¶ 37–38, 43, 60; *Gerico* Compl. ¶¶ 6–7; *Baymall* Compl. ¶ 6–7; *Blockbend* Compl. ¶¶ 6–7; *Escobar* Compl. ¶¶ 6–7; *Eastfork* Compl. ¶¶ 6–7; *Mailand* Compl. ¶ 6–7; *Saca* Compl. ¶ 25; *Barbachano* Am. Compl. ¶¶ 28, 67; *Triple R* Compl. ¶¶ 9, 49; *New Horizon* Compl. ¶¶ 9, 48; *Salcar* Compl. ¶¶ 9, 47; *Ruiz* Compl. ¶¶ 9, 46; *Iston* Compl. ¶¶ 9, 46; *Rendiles* Compl. ¶¶ 9, 45; *Perez* Compl. ¶¶ 9, 44; *Auburn* Compl. ¶¶ 9, 45; *Interland* Compl. ¶¶ 9, 45; *Velvor* Compl. ¶¶ 9, 52; *5C Invs.* Compl. ¶¶ 9, 43; *Asensio* Compl. ¶¶ 9, 48; *Bahia Del Rio* Am. Compl. ¶¶ 9, 44; *Archangel* Compl. ¶¶ 9, 45; *Blount* Am. Compl. ¶¶ 9, 40; *Diaz de Camara* Compl. ¶¶ 9, 43; *Dougherty* Am. Compl. ¶¶ 9, 47; *De Passos* Compl. ¶¶ 9, 46; *Echeverri* Compl. ¶¶ 9, 42; *Dougherty Novella* Am. Compl. ¶¶ 9, 51; *Richmon* Compl. ¶¶ 9, 44; *Sabillon* Compl. ¶¶ 9, 45; *San Blas* Am. Compl. ¶¶ 9, 49; *Smerant* Compl. ¶¶ 9, 44; *Mantecon* Compl. ¶¶ 9, 41; *Pharmafoods* Compl. ¶¶ 9, 48; *Tierra* Compl. ¶¶ 9, 67; *Mizrahi* Compl. ¶¶ 9, 47; *Quiroz Stone* Compl. ¶¶ 9, 45; *Nautical Village* Compl. ¶¶ 9, 45; *Positano* Compl. ¶¶ 9, 44; *Maplehurst* Compl. ¶¶ 9, 44; *Sand* Compl. ¶¶ 9, 42; *Rebac* Compl. ¶¶ 9, 44; *Brea* Compl. ¶¶ 9, 44; *Diaz* Compl. ¶¶ 9, 43; *Rosental* Compl. ¶¶ 9, 43; *Lyac* Compl. ¶¶ 9, 44; *Boltvinik* Compl. ¶¶ 9, 43; *TRE–C* Compl. ¶¶ 9, 43; *Skyworth* Compl. ¶¶ 9, 43; *Optic Blue* Compl. ¶ 12.

24. *See, e.g., Lopez* Am. Compl. ¶ 9; *Maridom* Am. Compl. ¶ 45; *Saca* Compl. ¶ 30.

25. *See Headway* Compl. ¶ 37, 75; *Lopez* Am. Compl. ¶ 86; *Valladolid* Compl. ¶¶ 9, 41; *Gerico* Compl. ¶ 73; *Baymall* Compl. ¶¶ 20, 63; *Blockbend* Compl. ¶ 69; *Escobar* Compl. ¶ 69; *Eastfork* Compl. ¶ 69; *Mailand* Compl. ¶ 58; *Saca* Compl. ¶¶ 25, 49; *Barbachano* Am. Compl. ¶¶ 14, 67–68; *Triple R* Compl. ¶¶ 42, 58, 90; *New Horizon* Compl. ¶¶ 42, 57, 89; *Salcar* Compl. ¶¶ 39, 88; *Ruiz* Compl. ¶¶ 39, 85; *Iston* Compl. ¶¶ 43, 90; *Rendiles* Compl. ¶¶ 43, 90; *Perez* Compl. ¶¶ 38, 85; *Auburn* Compl. ¶¶ 39, 86; *Interland* Compl. ¶¶ 39, 90; *Velvor* Compl. ¶¶ 39, 93; *5C Invs.* Compl. ¶¶ 39, 93; *Asensio* Compl. ¶¶ 35, 92; *Bahia Del Rio* Am. Compl. ¶¶ 38, 85; *Archangel* Compl. ¶¶ 43, 90; *Blount* Am. Compl. ¶¶ 38, 85; *Diaz de Camara* Compl. ¶ 84; *Dougherty* Am. Compl. ¶¶ 39, 88; *De Passos* Compl. ¶¶ 38, 87; *Echeverri* Compl. ¶¶ 37, 86; *Dougherty Novella* Am. Compl. ¶¶ 38, 92; *Richmon* Compl. ¶¶ 38, 85; *Sabillon* Compl. ¶¶ 37, 86; *San Blas* Am. Compl. ¶¶ 43, 90; *Smerant* Compl. ¶¶ 38, 85; *Mantecon* Compl. ¶ 38, 87; *Pharmafoods* Compl. ¶¶ 42, 89; *Tierra* Compl. ¶¶ 61, 108; *Mizrahi* Compl. ¶¶ 39, 88; *Quiroz Stone* Compl. ¶¶ 37, 86; *Nautical Village* Compl. ¶¶ 39, 85; *Positano* Compl. ¶¶ 38, 85; *Maplehurst* Compl. ¶¶ 38, 87; *Sand* Compl. ¶ 83; *Rebac* Compl. ¶¶ 38, 85; *Brea* Compl. ¶¶ 38, 85.

26. Although the Court has not ruled on the merits of some of the later-filed claims, it

The third securities broker-dealer fiduciary duty theory that the Court has recognized is the duty to inform investors of the risks of the transaction and to disclose all material facts. *See Anwar V*, 891 F.Supp.2d at 557 (finding such a claim was adequately pleaded in *Saca* ). (*See Saca* Compl. ¶ 53.)

The Standard Chartered Defendants argue that these breach of fiduciary duty claims necessarily involve false or misleading conduct: making an investment recommendation without performing adequate due diligence is a type of misrepresentation. (Dkt. No. 1384 ("May 29, 2015 SCB Letter Motion") at 3–4.) Pointing to *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, ⸺ U.S. ⸺, 135 S.Ct. 1318, 191 L.Ed.2d 253 (2015), the Defendants argue that a statement of opinion that lacks a good faith basis in fact—i.e., an investment recommendation without due diligence—constitutes an actionable misrepresentation or omission under the federal securities laws. (May 29, 2015 SCB Letter Motion at 4–5.) The Standard Chartered Defendants argue that, in any event, the Standard Chartered Plaintiffs' breach of fiduciary duty claims are "replete" with allegations of misrepresentations. (*Id.* at 5.)

Responding to the Defendants' arguments, the Standard Chartered Plaintiffs argue that breach of fiduciary duty claims in Florida do not depend on implied representations. (Dkt. No. 13 91 ("June 8, 2015 SCB Pls.' Letter") at 3.) Further, they note that there are several duties that a broker-dealer fiduciary owes to its clients. Although some of these duties, like the duty of full disclosure, might involve misrepresentations, others do not. (*Id.* at 4.)

The Court concludes that these three types of breach of fiduciary duty claims are not precluded by SLUSA. All of the Standard Chartered Plaintiffs allege some form of breach of fiduciary duty claim that is not predicated on false conduct by the Standard Chartered Defendants. In numerous rulings in this litigation, the Court has repeatedly held that allegations that the Standard Chartered Defendants conducted no due diligence (or that Standard Chartered executives have stated as such), or that the Defendants failed to monitor investments after aggressively recommending continued investment in the Funds, satisfactorily plead breach of fiduciary duty. The type of conduct at issue here—whether, for example, the Standard Chartered Defendants did not perform analytical tests as demanded of a fiduciary—entails an inquiry that is wholly distinct from the falsity wrongdoing underlying Madoff fraud. Those duties exist and are breached *regardless* of whether the Funds were merely a funnel to Madoff.

In addition to these three theories of fiduciary duty claims, the Standard Chartered Plaintiffs argue that claims involving the non-disclosure of fees paid to the Standard Chartered Defendants by the Funds should not be precluded under SLUSA.[27] (*See* May 29, 2015 SCB Pls.' Letter at 7–8.) They state that one plaintiff, Joaquina

---

notes that some of these complaints allege breach of fiduciary duty to monitor investments without alleging either aggressive marketing or even that the accounts were discretionary. *See Diaz* Compl. ¶ 51; *Rosental* Compl. ¶ 58; *Lyac* Compl. ¶ 59; *Boltvinik* Compl. ¶ 58; *TRE–C* Compl. ¶ 58; *Skyworth* Compl. ¶ 58.

27. An example of such a claim is the allegation that the Standard Chartered Defendants failed to disclose that they received a return for each dollar that each client put into the Funds. (May 29, 2015 SCB Pls.' Letter at 5.) Plaintiffs note, however, that "all [Standard Chartered] Plaintiffs will seek to offer evidence at trial concerning this claim." (*Id.* at 6 n. 4.)

Teresa Barbachano Herrero ("Barbachano"), has asserted such a claim. (*See Barbachano* Am. Compl. ¶¶ 73, 97.) The Standard Chartered Plaintiffs also note that while the Court has previously denied plaintiffs leave to amend complaints to include such allegations, the Court has permitted plaintiffs to offer supportive evidence at trial to support their existing claims. (*See* May 29, 2015 SCB Pls.' Letter at 5–6 (citing *Anwar v. Fairfield Greenwich Ltd.*, No. 09–CV–118, 2012 WL 1415621, *4 (S.D.N.Y. Apr. 13, 2012)).) The Standard Chartered Defendants respond that the Court has already considered the merits of a trailer fee claim and dismissed it. (Dkt. No. 1390 ("June 8, 2015 SCB Letter") at 4.)

The trailer fee allegations asserted by Barbachano turn on whether the Standard Chartered Defendants had a conflict of interest with respect to their involvement with BMIS and Madoff. Similar allegations were used to support Barbachano's negligent misrepresentation and fraud claims, which were later dismissed. *Anwar v. Fairfield Greenwich Ltd.*, 286 F.R.D. 258, 260 (S.D.N.Y.2012). In dismissing those claims, the Court noted that allegations of such fees were not sufficiently concrete to serve as a foundation for inferring fraudulent intent. *Id.* Barbachano cannot use such allegations of a conflict of interest in support of both her fraud-based claims and other duty-based claims. This condition is distinct from a plaintiff's claim seeking compensation for fees paid by the Funds to the Standard Chartered Defendants despite their failure to perform duties for which the fees were paid.[28] *See Kingate*, 784 F.3d at 152. Here, the

Standard Chartered Plaintiffs do not allege that the fees in question related to a service that the Standard Chartered Defendants failed to perform, but rather imply that the payment of such fees created a conflict of interest—i.e., that there was some complicity with the underlying Madoff fraud, or false conduct, by the Standard Chartered Defendants. Thus, plaintiffs' allegations of trailer fees here are precluded under SLUSA.

Under *Kingate*, courts are directed to consider the individual allegations of a claim. *See* 784 F.3d at 150–51. As all Standard Chartered Plaintiffs have adequately pleaded breach of fiduciary claims that are not predicated on allegations of trailer fees or on the Madoff fraud more generally, SLUSA does not preclude the Standard Chartered Plaintiffs' claims of breach of fiduciary duty.

### b. Gross Negligence and Negligence

██ The Florida Supreme Court has defined gross negligence as "an act or omission that a reasonable, prudent person would know is likely to result in injury to another." *Travelers Indem. Co. v. PCR, Inc.*, 889 So.2d 779, 793 n. 17 (Fla.2004) (quotation marks omitted). The Court has found that certain plaintiffs had adequately pleaded gross negligence by the Standard Chartered Defendants in recommending investments in the Funds without conducting proper due diligence beforehand-similar to a breach of fiduciary duty claim. *See Anwar III*, 745 F.Supp.2d at 378; *Anwar V*, 891 F.Supp.2d at 557–58. Such gross negligence claims remain standing in respect of many plaintiffs.[29] The allega-

---

**28.** The Court also notes that *Kingate* left open the question of whether such fee-based claims would be derivative, rather than direct, claims. *See* 784 F.3d at 152 n. 24.

**29.** *See Lopez* Am. Compl. ¶ 86; *Saca* Compl. ¶ 57–61; *Barbachano* Am. Compl. ¶¶ 90–101; *Triple R* Compl. ¶¶ 88–93; *New Horizon* Compl. ¶¶ 88–92; *Salcar* Compl. ¶¶ 86–91; *Ruiz* Compl. ¶¶ 84–87; *Iston* Compl. ¶¶ 89–92; *Rendiles* Compl. ¶¶ 89–92; *Perez* Compl.

tions that form the basis for such claims typically focus on the Standard Chartered Defendants' failure to perform due diligence, as well as their failure to exercise the degree of prudence, caution, and good business practices that would be expected of any reasonable investment professional. (*See, e.g., Mantecon* Compl. ¶ 88.)

Most Standard Chartered Plaintiffs have also pleaded negligence claims,[30] or have been granted leave to re-plead a uniform negligence claim.[31] For these claims, these plaintiffs typically allege that the Standard Chartered Defendants, by virtue of their superior knowledge, judgment, skill, and experience in rendering investment advice, had a duty of reasonable care

in recommending investment products and managing investment accounts. (*See, e.g., Mantecon* Compl. ¶ 60.) As part of this duty of care, the Standard Chartered Plaintiffs generally allege that the Standard Chartered Defendants had a duty to conduct a proper investigation of recommended investments, and breached this duty by, among other reasons, proposing investments without having conducted sufficiently careful and diligent examination of the investment. (*See, e.g., id.* at ¶¶ 61–62.)

The Court finds that the duty of care required in connection with these negligence and gross negligence claims are owed by securities broker-dealers regard-

---

¶¶ 84–87; *Auburn* Compl. ¶¶ 85–88; *Interland* Compl. ¶¶ 89–92; *Velvor* Compl. ¶¶ 92–95; *5C Invs.* Compl. ¶¶ 87–90; *Asensio* Compl. ¶¶ 91–94; *Bahia Del Rio* Am. Compl. ¶¶ 84–87; *Archangel* Compl. ¶¶ 89–92; *Blount* Am. Compl. ¶¶ 84–87; *Diaz de Camara* Compl. ¶¶ 83–86; *Dougherty* Am. Compl. ¶¶ 87–90; *De Passos* Compl. ¶¶ 86–89; *Echeverri* Compl. ¶¶ 85–88; *Dougherty Novella* Am. Compl. ¶¶ 91–94; *Richmon* Compl. ¶¶ 84–87; *Sabillon* Compl. ¶¶ 85–88; *San Blas* Am. Compl. ¶¶ 89–92; *Smerant* Compl. ¶¶ 84–87; *Mantecon* Compl. ¶¶ 86–89; *Pharmafoods* Compl. ¶¶ 88–91; *Tierra* Compl. ¶¶ 107–110; *Mizrahi* Compl. ¶¶ 87–90; *Quiroz Stone* Compl. ¶¶ 85–88; *Nautical Village* Compl. ¶¶ 85–88; *Positano* Compl. ¶¶ 84–87; *Maplehurst* Compl. ¶¶ 86–89; *Sand* Compl. ¶¶ 82–85; *Rebac* Compl. ¶¶ 84–87; *Brea* Compl. ¶¶ 84–87; *Diaz* Compl. ¶¶ 80–84; *Rosental* Compl. ¶¶ 80–84; *Lyac* Compl. ¶¶ 81–85; *Boltvinik* Compl. ¶¶ 80–84; *TRE–C* Compl. ¶¶ 80–84; *Skyworth* Compl. ¶¶ 80–84; *Optic Blue* Compl. ¶¶ 24–25.

**30.** *See Headway* Compl. ¶¶ 127–34; *Valladolid* Compl. ¶¶ 91–98.

**31.** In earlier decisions, the Court initially dismissed many of the plaintiffs' negligence claims after application of Florida's "economic loss rule." *See, e.g., Anwar IV*, 826 F.Supp.2d at 593. However, after the Florida Supreme Court clarified the application of the economic loss rule in *Tiara Condo. Ass'n Inc.*

*v. Marsh & McLennan Companies, Inc.*, 110 So.3d 399 (Fla.2013), the Court allowed plaintiffs to uniformly re-plead negligence claims that had been dismissed under the economic loss rule. (*See.* Dkt. Nos. 1137, 1141, 1309.) *See Almiron* Compl. ¶¶ 85–90; *Carrillo* Compl. ¶¶ 86–91; *Gerico* Compl. ¶¶ 91–93; *Baymall* Compl. ¶ 70–72; *Blockbend* Compl. ¶¶ 76–78; *Escobar* Compl. ¶¶ 75–77; *Eastfork* Compl. ¶ 76–78; *Mailand* Compl. ¶¶ 65–67; *Saca* Compl. ¶ 44–47; *Barbachano* Compl. ¶¶ 44–51; *Triple R* Compl. ¶¶ 62–73; *New Horizon* Compl. ¶¶ 61–72; *Salcar* Compl. ¶¶ 61–71; *Ruiz* Compl. ¶¶ 58–68; *Iston* Compl. ¶¶ 63–73; *Rendiles* Compl. ¶¶ 63–73; *Perez* Compl. ¶¶ 58–68; *Auburn* Compl. ¶¶ 59–69; *Interland* Compl. ¶¶ 63–73; *Velvor* Compl. ¶¶ 66–76; *5C Invs.* Compl. ¶¶ 61–71; *Asensio* Compl. ¶¶ 65–75; *Bahia Del Rio* Am. Compl. ¶¶ 58–68; *Archangel* Compl. ¶¶ 62–72; *Blount* Am. Compl. ¶¶ 57–67; *Diaz de Camara* Compl. ¶¶ 57–67; *Dougherty* Am. Compl. ¶¶ 61–71; *De Passos* Compl. ¶¶ 60–70; *Echeverri* Compl. ¶¶ 59–69; *Dougherty Novella* Am. Compl. ¶¶ 64–74; *Richmon* Compl. ¶¶ 57–67; *Sabillon* Compl. ¶¶ 58–68; *San Blas* Am. Compl. ¶¶ 62–72; *Smerant* Compl. ¶¶ 67–77; *Mantecon* Compl. ¶¶ 60–70; *Pharmafoods* Compl. ¶¶ 61–71; *Tierra* Compl. ¶¶ 80–90; *Mizrahi* Compl. ¶¶ 61–71; *Quiroz Stone* Compl. ¶¶ 59–69; *Nautical Village* Compl. ¶¶ 59–69; *Positano* Compl. ¶¶ 57–67; *Maplehurst* Compl. ¶¶ 60–70; *Sand* Compl. ¶¶ 54–64; *Rebac* Compl. ¶¶ 57–67; *Brea* Compl. ¶¶ 57–67.

less of the underlying Madoff fraud. Allegations of the underlying fraud are not essential for plaintiffs to plead a sufficient negligence or gross negligence claim; allegations that the Standard Chartered Defendants failed to conduct due diligence and thus breached their duty of care to the Standard Chartered Plaintiffs are sufficient. Thus, the Standard Chartered Plaintiffs' surviving negligence and gross negligence claims are not precluded by SLUSA.

### c. Fraud–Based Claims and Negligent Misrepresentation Claims

■ Of the three unified motions to dismiss in the Standard Chartered Action, the Court has found only one complaint that adequately pleaded negligent misrepresentation and fraud claims. *See Anwar III*, 745 F.Supp.2d at 371–73. And even then, those claims survived only insofar as they are based on allegations of "Standard Chartered's failure to disclose that [a

Fund] was a funnel to Madoff." *Id.* at 373. Plaintiffs who filed complaints after the Court's decisions in *Anwar III* and *Anwar IV* have based negligent misrepresentation claims on allegations that the Standard Chartered Defendants made a material omission by failing to disclose to investors that the Funds were simply a "funnel" to BMIS.[32] (*See, e.g., Quiroz* Compl. ¶ 72.) Similarly, the later-filed fraud claims are premised on the Standard Chartered Defendants' "actual knowledge or [severe recklessness] in not knowing that the *modus operandi* of the [Funds was] simply to turn over funds to [BMIS]."[33] (*See, e.g., Quiroz* Compl. ¶ 80.)

These negligent misrepresentation and fraud claims are precluded by SLUSA. The Standard Chartered Plaintiffs concede that "Madoff Claims" are precluded (*see* May 29, 2015 SCB Pls.' Letter at 5), and these negligent misrepresentation and fraud claims fall within the Standard Chartered Plaintiffs' description of "Madoff

---

**32.** *See Maridom* Am. Compl. ¶¶ 31, 53, 58–59; *Triple R* Compl. ¶ 76; *New Horizon* Compl. ¶ 75; *Salcar* Compl. ¶ 74; *Ruiz* Compl. ¶ 71; *Iston* Compl. ¶ 76; *Rendiles* Compl. ¶ 76; *Perez* Compl. ¶ 71; *Auburn* Compl. ¶ 72; *Interland* Compl. ¶ 76; *Velvor* Compl. ¶ 79; *5C Invs.* Compl. ¶ 74; *Asensio* Compl. ¶ 78; *Bahia Del Rio* Am. Compl. ¶ 71; *Archangel* Compl. ¶ 76; *Blount* Am. Compl. ¶ 71; *Diaz de Camara* Compl. ¶ 70; *Dougherty* Am. Compl. ¶ 74; *De Passos* Compl. ¶ 73; *Echeverri* Compl. ¶ 72; *Dougherty Novella* Am. Compl. ¶ 78; *Richmon* Compl. ¶ 71; *Sabillon* Compl. ¶ 72; *San Blas* Am. Compl. ¶ 76; *Smerant* Compl. ¶ 71; *Mantecon* Compl. ¶ 73; *Pharmafoods* Compl. ¶ 75; *Tierra* Compl. ¶ 94; *Mizrahi* Compl. ¶ 74; *Quiroz Stone* Compl. ¶ 72; *Nautical Village* Compl. ¶ 72; *Positano* Compl. ¶ 71; *Maplehurst* Compl. ¶ 73; *Sand* Compl. ¶ 69; *Rebac* Compl. ¶ 71; *Brea* Compl. ¶ 71; *Diaz* Compl. ¶ 64; *Rosental* Compl. ¶ 64; *Lyac* Compl. ¶ 65; *Boltvinik* Compl. ¶ 64; *TRE–C* Compl. ¶ 64; *Skyworth* Compl. ¶ 64.

**33.** *See Maridom* Am. Compl. ¶¶ 58–89; *Triple R* Compl. ¶¶ 83–78; *New Horizon* Compl. ¶¶ 83–86; *Salcar* Compl. ¶¶ 82–85; *Ruiz* Compl. ¶¶ 78–82; *Iston* Compl. ¶¶ 84–86; *Rendiles* Compl. ¶¶ 84–86; *Perez* Compl. ¶¶ 79–81; *Auburn* Compl. ¶¶ 80–82; *Interland* Compl. ¶¶ 84–86; *Velvor* Compl. ¶¶ 87–89; *5C Invs.* Compl. ¶¶ 82–84; *Asensio* Compl. ¶¶ 86–88; *Bahia Del Rio* Am. Compl. ¶¶ 79–81; *Archangel* Compl. ¶¶ 84–86; *Blount* Am. Compl. ¶¶ 79–91; *Diaz de Camara* Compl. ¶¶ 78–80; *Dougherty* Am. Compl. ¶¶ 82–84; *De Passos* Compl. ¶¶ 81–83; *Echeverri* Compl. ¶¶ 80–82; *Dougherty Novella* Am. Compl. ¶¶ 86–88; *Richmon* Compl. ¶¶ 79–81; *Sabillon* Compl. ¶¶ 80–82; *San Blas* Am. Compl. ¶¶ 84–86; *Smerant* Compl. ¶¶ 79–81; *Mantecon* Compl. ¶¶ 81–83; *Pharmafoods* Compl. ¶¶ 83–85; *Tierra* Compl. ¶¶ 102–104; *Mizrahi* Compl. ¶¶ 82–84; *Quiroz Stone* Compl. ¶¶ 80–82; *Nautical Village* Compl. ¶¶ 80–82; *Positano* Compl. ¶¶ 79–81; *Maplehurst* Compl. ¶¶ 81–83; *Sand* Compl. ¶¶ 77–79; *Rebac* Compl. ¶¶ 79–81; *Brea* Compl. ¶¶ 79–81; *Diaz* Compl. ¶¶ 75–77; *Rosental* Compl. ¶¶ 75–77; *Lyac* Compl. ¶¶ 76–78; *Boltvinik* Compl. ¶¶ 75–77; *TRE–C* Compl. ¶¶ 75–77; *Skyworth* Compl. ¶¶ 75–77; *Optic Blue* Compl. ¶¶ 14–17.

Claims"—claims where essential allegations of omissions centered on the Funds' connections to BMIS and Madoff. The failure to disclose that the Funds were a "funnel" to BMIS implicitly involves allegations of either complicity (as to the fraud claims) or some other false conduct (as to the negligent misrepresentation claims) by the Standard Chartered Defendants. These negligent misrepresentation and fraud claims were clearly "made in connection with the Funds' investments with Madoff in covered securities and with [the PwC Defendants'] oversight of these investments." *Kingate*, 784 F.3d at 134–35. Thus, they are precluded under SLUSA.

### E. RULE 21 AND RULE 41: Standard Chartered Plaintiffs' Request to Drop Plaintiffs and Dismiss Claims

Finally, the Court turns to the motion of seven plaintiffs in the Standard Chartered Action seeking the Court's permission to have them dropped as plaintiffs or to have their cases dismissed. (Dkt. No. 1331 (the "Curran Motion").) That request was made by Laurence Curran of Curran Law PL ("Curran"), counsel to 54 plaintiffs in 42 of the Standard Chartered cases. The Curran Motion seeks to have five plaintiffs dropped in accordance with Federal Rule of Civil Procedure 21 ("Rule 21"),[34] and have the actions of two plaintiffs dismissed

pursuant to Federal Rule of Civil Procedure 41 ("Rule 41").[35] The Curran Motion argues that the requested relief would reduce the number of depositions, would enhance judicial efficiency, and would not be prejudicial to the Standard Chartered Defendants. (*Id.* at 3.)

By letter dated October 27, 2014, the Standard Chartered Defendants opposed the Curran Motion. (Dkt. No. 1332.) The Standard Chartered Defendants argue that the Court should not rule on the motion until after the SLUSA issue is decided, indicating that they "will be happy to work" with the plaintiffs who seek to effect dismissal of their claims.[36] (*Id.* at 1.) Further, the Standard Chartered Defendants suggest that the Curran Motion represents procedural maneuvering to bypass SLUSA by dropping the number of plaintiffs to fewer than 51. (*Id.* at 2.) They point to the number of plaintiffs currently represented by Curran, and the timeline of the events leading up to the Curran Motion. (*Id.* at 1–2.)

Under Rule 21, the court may, on motion or *sua sponte*, "at any time, on just terms, add or drop a party." Fed.R.Civ.P. 21. While the rule is labeled "misjoinder of parties," its application is not limited to instances of misjoinder. Its scope is

---

**34.** Those five plaintiffs include: plaintiff Continental Rainbow Group, Inc., in *New Horizon;* plaintiff Nemagus Ltd. in *Iston;* and three plaintiffs, Ali Ltd., Bellwood Ltd., and Accent Group Ltd., in *Tierra*. All five of those plaintiffs hold shares in Fairfield Sentry, but they did not make any direct investment in Fairfield Sentry. If these plaintiffs were to be dropped, the actual purchasers of those Fairfield Sentry shares would remain as plaintiffs in those actions. (Curran Motion at 1–2.)

**35.** The plaintiff in *Quiroz Stone* seeks permission to have his case dismissed because discovery has indicated that the investment in Fairfield Sentry described in his complaint was "likely" made through non-plaintiff Pon-

ciana Holdings Ltd. and not by the plaintiff through his personal account. The plaintiff in *Lyac* seeks to have his complaint dismissed after having determined that his loss incurred from investment in Fairfield Sentry was small. (Curran Motion at 2.)

**36.** The Standard Chartered Defendants also state that the request to withdraw is "not entirely straightforward," because it involves issues concerning the scope of claims being asserted and whether the plaintiffs' stated reasons for seeking dismissal contradict allegations made in their complaints or interrogatory responses. (Dkt. No. 1332 at 2 n. 2.)

broader, affording courts discretion to shape litigation in the interests of efficiency and justice. "In exercising its discretion under Rule 21, the court must consider 'principles of fundamental fairness and judicial efficiency.'" 4–21 Moore's Federal Practice 3d § 21.02[4] (2015) (footnotes omitted).

■ Rule 41(a), on the other hand, permits plaintiffs to seek dismissal of their action. After the entry of an answer or motion for summary judgment, an action "may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper." Rule 41(a)(2). Such a dismissal can be made either with or without prejudice. Relevant factors the Court may consider include: "the plaintiff's diligence in bringing the motion; any 'undue vexatiousness' on plaintiff's part; the extent to which the suit has progressed, including the defendant's effort and expense in preparation for trial; the duplicative expense of relitigation; and the adequacy of plaintiff's explanation for the need to dismiss." *Zagano v. Fordham Univ.*, 900 F.2d 12, 14 (2d Cir.1990) (internal quotation marks omitted). *See also Camilli v. Grimes*, 436 F.3d 120, 123 (2d Cir.2006) (noting that, instead of considering the *Zagano* factors, some courts' look primarily to whether the defendant would suffer some "plain legal prejudice other than the mere prospect of a second lawsuit").

Courts have recognized that such requests to dismiss actions or drop plaintiffs can be denied when the request is clearly an attempt to evade SLUSA. *See In re WorldCom, Inc. Sec. Litig.*, No. 02–CV–3288, 2004 WL 692746, at *5 (S.D.N.Y. Apr. 2, 2004) ("*WorldCom II*") ("It is unnecessary, and would be wasteful and wrong, to permit counsel for the plaintiff more time in support of their effort to fashion another tactic to evade SLUSA.");

*see also Lee v. Marsh & McLennan Companies Inc.*, No. 06–CV–15448, 2007 WL 704033, at *2–4 (S.D.N.Y. Mar. 7, 2007) (granting plaintiffs' motion for remand after Rule 41 dismissals, upon a finding that removing deceased, duplicative, and mistaken names from the list of parties to the original action did not constitute "impermissible procedural maneuvering").

■ The Court agrees with the Standard Chartered Defendants that the sequence of events leading up to the Curran Motion supports a reasonable inference that Curran's motivation was to bring the number of plaintiffs he personally represented to below 51. On September 29, 2014, the Court held a pre motion conference with the Standard Chartered parties. At that conference, Standard Chartered Plaintiffs' Liaison Counsel first argued their theory that under SLUSA, a "group of lawsuits" is necessarily one deliberately grouped by plaintiffs. Liaison Counsel conceded, however, that if the number of plaintiffs represented by Curran is greater than 50, then "maybe his cases are barred." (Transcript of Sept. 29, 2014 Conference at 35.) Ten days after the Court conference, Curran wrote directly to the Standard Chartered Defendants seeking consent to drop the seven plaintiffs. (Dkt. No. 1332 at 2 n. 2.) The Standard Chartered Defendants opposed this request. (*Id.*) After that, on October 21, 2014, Curran submitted his motion to the Court on behalf of seven individual plaintiffs who wish to leave the litigation. Currently, the total number of plaintiffs represented by Curran is 54. If Curran's request were granted, the number of plaintiffs he represents would be 47. This sequence of events provides strong circumstantial support a finding that the Curran Motion was motivated by a desire to reduce the number of Curran's plaintiffs to below 51 in the event that the

Court were to rule that some degree of purposeful coordination by plaintiffs is required to constitute a "group of lawsuits" under SLUSA.

However, the Court has now rejected the Standard Chartered Plaintiffs' theory of grouping. Even were the Curran Motion granted, the number of plaintiffs remaining for purposes of SLUSA would be greater than 50. Currently pending before this Court are 56 cases representing 74 plaintiffs for purposes of the SLUSA "group of lawsuits" analysis. If 7 plaintiffs were dropped, 66 plaintiffs would remain; the Standard Chartered Action would nonetheless remain a "group of lawsuits" under SLUSA.

For the reasons discussed above, the Court denies the Curran Motion without prejudice. The Court will not grant a motion under Rule 21 or Rule 41 if there is a strong inference that it is primarily designed to evade SLUSA's 50 plaintiff threshold. The Court denies the Curran Motion without prejudice, however, to enable the parties to attempt reaching a resolution of these claims with the knowledge that SLUSA will apply regardless of those plaintiffs' continuation in the Standard Chartered Action. If, following such efforts, those plaintiffs still seek dismissal, they can re-submit their request to the Court.

## III. *ORDER*

For the reasons discussed above, it is hereby

**ORDERED** that the motion to dismiss the Second Consolidated Amended Complaint of the Anwar Plaintiffs, as described in the decision above, under the Securities Litigation Uniform Standards Act of 1998 ("SLUSA") (Dkt. No. 1383) of defendants PricewaterhouseCoopers Accountants N.V. and PricewaterhouseCoopers LLP is

**GRANTED** in part and **DENIED** in part; and it is further

**ORDERED** that the motion to dismiss the complaints of the Standard Chartered Plaintiffs, as described in the decision above, under SLUSA (Dkt. No. 1384) of defendants Standard Chartered Bank International (Americas) Ltd., Standard Chartered International (USA) Ltd., Standard Chartered Bank, and Standard Chartered PLC is **GRANTED** in part and **DENIED** in part; and it is further

**ORDERED** that the motion (Dkt. No. **1331**) of plaintiffs Continental Rainbow Group Inc., Nemagus Ltd., Ali Ltd., Bellwood Ltd., and Accent Group Ltd., to be dropped as plaintiffs under Federal Rule of Civil Procedure **21** is **DENIED** without prejudice; and it is further

**ORDERED** that the motion (Dkt. No. 1331) of plaintiffs Juan D. Quiroz Stone and Lyac Venture Corp. dismissing their actions pursuant to Federal Rule of Civil Procedure 41(a)(2) is **DENIED** without prejudice.

**SO ORDERED.**